IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| RICKY COLLIER ) | |
| ) | |
| v. ) | No. 1:07-0042 |
| ) | Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To:   The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits, as provided under Titles II and XVI of the Social Security Act ("the Act"). The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 13), to which defendant has responded (Docket Entry No. 17). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 8), and for the reasons given below, the undersigned recommends that plaintiff's motion be **DENIED**, and that the decision of the SSA be **AFFIRMED**.

### I. Procedural History

Plaintiff filed DIB and SSI applications in June of 2000, alleging disability commencing December 31, 1999 due to illiteracy (Tr. 59-61, 72-81). These applications were

1

denied upon initial review by the state agency designee of the SSA on September 21, 2000 (Tr. 28-29, 252-53), and no further appeal was pursued.

On July 13, 2001, plaintiff filed new DIB and SSI applications, again alleging disability commencing December 31, 1999 due to illiteracy. (Tr. 62-65A, 92, 106, 259-62) This claim was denied initially (Tr. 30-31, 263-64), whereupon plaintiff requested reconsideration in light of the effects of his mental difficulties and residuals of a broken tailbone (Tr. 132). After reconsidering the evidence of record, the state agency again denied plaintiff's disability claim, and notified him of his right to request a *de novo* hearing before an Administrative Law Judge ("ALJ") (Tr. 46-47; 267-68). After filing his request for such a hearing, plaintiff appeared with counsel before the ALJ on October 16, 2003, when testimony was received from plaintiff and an impartial vocational expert (Tr. 274-312). On January 6, 2003, the ALJ issued a written decision in which he found plaintiff not disabled and denied the pending applications for benefits (Tr. 9-17). After an unsuccessful appeal to the Administration's Appeals Council (Tr. 5-8), plaintiff filed suit in this court, and succeeded in obtaining an agreed reversal of the SSA's decision with remand for further administrative proceedings (Tr. 344-45).

Following the remand by this court, the ALJ held a second hearing on plaintiff's claims, where plaintiff was again represented by counsel and testimony was again received from plaintiff and an impartial vocational expert (Tr. 355-84). At the conclusion of the hearing, the ALJ took the case under advisement. On April 25, 2006, the ALJ issued a second decision finding plaintiff not disabled (Tr. 324-38). This second ALJ decision contains the following enumerated facts:

1.    The claimant met the insured status requirements of the Social Security Act

through September 30, 2004.

2. The claimant has not engaged in substantial gainful activity at any time since the alleged onset date (20 CFR 202.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3. The claimant has the following severe impairments: dysthymia (with a history of malingering and noncompliance with treatment); an antisocial personality disorder; estimated borderline intelligence (valid IQ scores not established at 70 or below); residuals of a fractured coccyx (with mechanical low back pain); and an ongoing drug abuse/alcoholism (DA/A) condition (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant's impairments, including the substance use disorder(s), meet section(s) 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

5. Because the claimant's impairments, including the substance use disorder(s), meet the criteria of a listed impairment, the claimant is under a "disability," as defined in the Social Security Act (20 CFR 404.1520(d) and 416.920(d)).

6. If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

7. If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

8. If the claimant stopped the substance use, the claimant would have the residual functional capacity to lift 35-40 pounds, with no repetitive lifting or bending, no limitations on standing/walking, and no limitations on sitting other than a need to avoid prolonged sitting on hard surfaces, with mental functional ability to understand, remember and carry out short and simple instructions and make judgments on simple work-related decision, and with a need to avoid work requiring public contact, production rate pace work and changing work procedures or requirements.

9. If the claimant stopped the substance use, the claimant would be unable to perform past relevant work (20 CFR 404.1565 and 416.965).

10. The claimant was born on March 17, 1964, is now 42 years old and was 35 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

11. The claimant is functionally illiterate (20 CFR 404.1564 and 416.964).

12. Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568 and 416.968).

13. If the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

14. Because the claimant would not be disabled if he stopped the substance use (20 CFR 404.1520(g) and 416.920(g)), the claimant's substance use disorder(s) (DA/A) is a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935). Thus, the claimant has not been disabled within the meaning of the Social Security Act at any time through the date of this decision.

(Tr. 330-38)

By notice dated April 3, 2007, the Appeals Council declined to assume jurisdiction over the case, finding that the ALJ had conducted a full evaluation of the evidence and reached the appropriate conclusions on all issues; the Council noted that the ALJ's decision thus stood as the Administration's final decision. (Tr. 313) This action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

### A. <u>Medical Evidence</u>

As an initial matter, there does not appear to be any dispute as to plaintiff's physical limitations or the appropriateness of the ALJ's finding of same (Tr. 215-16, 336), which plaintiff does not challenge. (Docket Entry No. 14 at 3, 5-9) Accordingly, this review is devoted to the record of plaintiff's mental health treatment and the corresponding assessments of his work-related mental limitations.

Plaintiff has been examined at government expense on three separate occasions by three different one-time psychological consultants, in conjunction with both his current and prior applications for benefits. In August of 2000, Dr. Deborah E. Doineau, Ed.D., examined plaintiff and opined that, while he appeared to be low functioning, he did not appear to be mentally retarded and was able to interact appropriately with others (Tr. 160, 164). Plaintiff reported to Dr. Doineau that he drank alcohol "now and then," smoked cannabis "off and on," and occasionally took Valium that he obtained from friends. (Tr. 160-61) After administering the Wechsler Adult Intelligence Scale to measure plaintiff's intellectual functioning, Dr. Doineau reported scores that would have satisfied the diagnostic criteria for mild mental retardation, except that she cautioned that these scores "should be viewed as minimally representative of [plaintiff's] true level of functioning" because he "made absolutely no effort on many tasks presented to him" (Tr. 163). After achievement testing scores revealed significantly reduced abilities in the areas of reading, spelling, and arithmetic, Dr. Doineau opined that plaintiff suffered from deficient academic skills including functional illiteracy and borderline intellectual functioning. (Tr. 162, 165)

In September of 2000, plaintiff's records were reviewed by a nonexamining

5

state agency consultant who opined that plaintiff suffered marked limitation in the ability to carry out detailed instructions, and moderate limitations in the ability to maintain concentration and attention for extended periods, to perform activities within a schedule, to complete normal workweeks without psychological interruptions, to interact appropriately with the general public, and to accept instruction/criticism properly and set realistic goals. (Tr. 181-83)

Plaintiff's second consultative psychological examination was performed in August of 2001, by Mr. James Proffitt, M.S., LPE, and Dr. Alan Yarbrough, Ed.D. (Tr. 185-89). The examiners noted that plaintiff appeared "evasive," with "avoidant" eye contact and a "manipulative" attitude. (Tr. 186-87) Plaintiff reported that he is unable to be around other people because he is "disgusted over not being able to work." (Tr. 185) He also reported hearing voices that said "come on." Id. Plaintiff reported past suicidal thoughts when he became depressed from sleeping in the cold weather. Id. He reported taking Valium, smoking cannabis, and, on rare occasions, drinking beer. Id. Like Dr. Doineau before them, the examiners reported results on IQ testing consistent with mild mental retardation, but viewed these results as underrepresentative of plaintiff's true level of intellectual functioning in light of plaintiff's relatively good conversational ability and his "variable effort" on testing; "malingering" was therefore included among their diagnostic impressions of plaintiff. (Tr. 186-88)

Plaintiff's third and final consultative psychological examination was not performed until August of 2005. In the interim, plaintiff sought treatment at the Centerstone Community Mental Health Centers, Inc. ("Centerstone"), beginning in October of 2001. His psychiatric care was provided by Dr. Madhavi Mallipeddi, M.D., from October

6

2001 through May 2002, after which plaintiff discontinued treatment at Centerstone until October of 2002, when he was seen for the final time by Dr. Mallipeddi. Plaintiff thereafter resumed psychiatric care at Centerstone in June of 2004, when Dr. James Graves, M.D., took over his case and followed plaintiff for the next year, until July of 2005. Plaintiff also received counseling at Centerstone at intervals roughly following his intermittent pursuit of medical treatment (Tr. 449).

Dr. Mallipeddi conducted an initial interview of plaintiff on October 3, 2001, when she noted his report of a history of depression, loss of interest in activities, changing sleeping patterns, and dependence upon cannabis and Valium, as well as incidences of hearing voices. (Tr. 192) Dr. Mallipeddi diagnosed major depressive disorder with psychosis, as well as cannabis use in remission, and prescribed both antidepressant and antipsychotic medications. Plaintiff was subsequently noted to have discontinued these prescribed medications due to a side effect of nausea; Dr. Mallipeddi noted her strong suspicion that plaintiff was at that time abusing cannabis and Valium. (Tr. 237) On followup in December of 2001, Dr. Mallipeddi noted that plaintiff was experiencing increased irritability and nervousness, and also noted her suspicion that plaintiff was seeking a prescription for Valium (Tr. 236). Thereafter, in March of 2002, plaintiff was again noted to be seeking Valium when he told Dr. Mallipeddi that it was the only medication that helped him (Tr. 234). During an appointment on May 9, 2002, Dr. Mallipeddi noted that plaintiff had denied alcohol and drug use, but subsequently admitted taking his mother's Valium and drinking one beer after an unscheduled drug screen was suggested by Dr. Mallipeddi (Tr. 233).

Plaintiff did not return to followup with Dr. Mallipeddi until October 9, 2002,

7

when Dr. Mallipeddi examined him and observed that he had discontinued care six months earlier when an unscheduled drug screen was ordered (Tr. 227). Dr. Mallipeddi also noted that plaintiff denied using drugs during the intervening six months, but would not agree to be screened for drugs at that appointment. Id. Dr. Mallipeddi diagnosed late onset dysthymia, cannabis abuse, cannabis-induced psychosis, and antisocial panic disorder with hallucinations; she prescribed medications and a return appointment in eight weeks. Id. Plaintiff did not show for this return appointment on December 9, 2002, and Dr. Mallipeddi put a hold on any refills of plaintiff's medication until he submitted to an unscheduled drug screen (Tr. 226). The record does not contain any results of such a drug screen, and plaintiff failed to show for followup appointments with Dr. Mallipeddi in October and November of 2003. (Tr. 471, 472)

Plaintiff was first examined by Dr. Graves on June 22, 2004, when he was noted to be presenting for his third intake in as many years for complaints of depression, having reportedly failed to follow up on his first two stints with Centerstone because of his mother's health (Tr. 448). Dr. Graves noted that the history given by plaintiff amounted to "pretty much a diffuse picture of low grade symptoms." Id. Dr. Graves renewed plaintiff's prescription for the antidepressant Lexapro (Tr. 452), and next followed up with plaintiff on July 9, 2004 (Tr. 430), and then again on January 5, 2005 (Tr. 423). At both of these followup appointments, Dr. Graves observed that plaintiff seemed less depressed. In his January 5, 2005 psychosocial assessment of plaintiff, Dr. Graves observed that, although plaintiff "claim[ed] to be too insecure and paranoid to get public work, he could probably do much more if he tried harder" (Tr. 423). At his final appointment with Dr. Graves, on July 9, 2005, plaintiff was noted to display appropriate affect and behavior, though his motivation for

8

treatment was poor (Tr. 419). Plaintiff did not show for appointments with Dr. Graves on August 23, 2004 (Tr. 436), December 6, 2004 (Tr. 428), and October 10, 2005 (Tr. 414).

Plaintiff's condition was periodically assessed by Centerstone staff on Tennessee Clinically Related Group ("CRG") forms. The first of these CRG assessments, dated September 8, 2003, reflects extreme limitation of plaintiff's ability to perform daily activities; marked impairment of interpersonal functioning and the ability to maintain concentration, persistence at tasks, and pace; and extreme limitation of the ability to adapt to change (Tr. 466-67). The rater concluded that plaintiff had a severe and persistent mental illness (Tr. 468).

The second CRG assessment, dated May 5, 2004, reflects a finding of no severe functional impairment. (Tr. 463-64) Though plaintiff was still categorized as having a severe and persistent mental illness, it was noted that "Client intake interview and record have significant discrepancies (Tr. 465).

The third CRG assessment, dated September 13, 2004, reflects a finding of moderate restriction on plaintiff's ability to perform activities of daily living and his ability to adapt to change, and marked restriction of plaintiff's interpersonal functioning and his abilities to concentrate, persist at tasks, and maintain pace (Tr. 460-61). Plaintiff was again categorized as having a severe and persistent mental illness (Tr. 462).

The fourth and final CRG assessment, dated July 9, 2005, reflects findings of moderate restriction of plaintiff's interpersonal functioning and his abilities to perform activities of daily living, to concentrate, persist at tasks, and maintain pace, and to adapt to change (Tr. 457-58). Incongruously with the instructions on the form, the rater categorized plaintiff as being formerly severely impaired (Tr. 459).

9

On August 4, 2005, plaintiff presented for his third and final consultative psychological examination, performed by Dr. James McFerrin, M.D. (Tr. 400-03). Plaintiff reported to Dr. McFerrin that he hears voices or commands to hurt himself, and that he had attempted suicide once by choking himself with his hands (Tr. 401-02). Dr. McFerrin observed that plaintiff was basically oriented, with a blunt affect and poor social skills (Tr. 402). He also observed that plaintiff was cognitively intact, despite his slowness. Id. Dr. McFerrin assessed plaintiff's judgment, insight, and motivation as fair to poor Id. He diagnosed major depression, recurrent and moderate, with a history of psychosis versus malingering, cannabis dependency, and Valium abuse versus dependency. Id. Without testing plaintiff's IQ, Dr. McFerrin diagnosed mental retardation, borderline to mild. Id. Dr. McFerrin felt that plaintiff suffered marked impairment in his ability to understand and carry out detailed instructions, and in his judgment on simple, work-related decisions (Tr. 404). Dr. McFerrin otherwise assessed moderate psychological impairment affecting plaintiff's interaction with the public and his peers, as well as his ability to respond appropriately to work pressures and changes in his work setting (Tr. 405). Dr. McFerrin concluded his report by noting that "chronic cannabis use and benzodiazepine abuse vs. dependency" would effect plaintiff's work performance by causing lethargy and poor motivation (Tr. 405), and that his assessment of plaintiff would change if this chemical abuse were eliminated, in that "[c]laimant would be more amendable to unskilled labor and motivation, interest and energy should improve from abstinence from the sedating and mood-altering chemicals." (Tr. 406)

B. Testimonial Evidence

Plaintiff's second ALJ hearing began with a discussion on counsel's argument

that the final CRG assessment form should be construed to reflect an assessment that plaintiff at that time was suffering "severe and persistent mental illness," rather than being "formerly severely impaired" as indicated on the form (Tr. 358-59, 459). The ALJ took this argument under advisement, having determined that counsel's objection went to the CRG form's weight and not its admissibility (Tr. 359).

Plaintiff testified that he had not consumed alcohol or used any illegal drugs since his first hearing in October of 2003 (Tr. 361). He testified that he had used cannabis while he was in school because he had been depressed over his inability to read, write, or otherwise excel in school, and his resulting rejection by his peers (Tr. 368). He testified that he stopped using cannabis four or five years prior to his second hearing. <u>Id.</u> He felt that his educational limitations were the cause of his inability to work (Tr. 362, 364-65). Plaintiff testified that he will sometimes visit friends in their homes, and that he goes to church (Tr. 367), but that his is unable to be around a lot of people because it makes him depressed (Tr. 365).

The vocational expert testified to the classification of plaintiff's past relevant work and, in response to the ALJ's hypothetical questions incorporating plaintiff's residual functional capacity and vocational factors, further testified that plaintiff's past relevant work would be precluded by such limitations. (Tr. 360, 372) The vocational expert was able to identify several jobs which would accommodate the hypothetical limitations mentioned by the ALJ, and confirmed that a score of 50 or below on the Global Assessment of Functioning ("GAF") scale would preclude these jobs, while a score above 50 would allow the jobs. (Tr. 372-73) The expert also testified that if plaintiff's testimony that he fell asleep during the day were credited, he would be unable to perform the jobs identified. (Tr. 375)

11

## III. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

12

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE")

13

testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff first takes issue with the ALJ's finding that his mental health providers' continuing assignment of low GAF scores during the period in which he alleges abstinence from drugs supports the notion that plaintiff was in fact not abstaining from drugs.  Plaintiff argues that the converse is obviously true:  "that the abstinence did not make a difference in his [GAF] ratings due to his mental retardation..." (Docket Entry No. 14 at 5). However, the ALJ's conclusion with regard to plaintiff's GAF scores is easily supported by substantial evidence -- indeed, by the great weight of the evidence -- on this record which well documents plaintiff's abuse of both street and prescription drugs, as well as his abuse of the disability determination process itself through his perceived lack of effort and evasiveness during consultative examinations.  Quite simply, the ALJ's thorough and well-written decision documents the repeated observations by treating and nontreating sources alike of plaintiff's apparent lack of candor, lack of effort on testing, and noncompliance with prescribed therapy and pharmacological treatment.  (Tr. 330-33)  Even aside from this record support for the ALJ's position, his finding that plaintiff's testimony regarding abstinence is

14

not credible is deserving of "great weight and deference" because of his opportunity to observe plaintiff's demeanor while testifying at two hearings, Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003), and certainly may not be set aside on the unsupported theory offered by plaintiff.

Plaintiff next challenges the ALJ's overruling of his argument that the July 9, 2005 CRG form should have been construed as though it contained a mark categorizing plaintiff as "severely mentally impaired," though it in fact contains a mark designating plaintiff as "formerly severely impaired." The ALJ explained that because of this confusing designation, as well as the form's assessment of plaintiff's GAF at 50 despite elsewhere classifying his symptoms as moderate, "[t]he July 9, 2005, CRG is too internally inconsistent to be accorded any weight in the decision with regard to assigning specific work-related limitations." (Tr. 332) This finding was within the province of the ALJ, who is charged with the duty, and vested with the discretion, to resolve significant conflicts in the record evidence. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997)(citing Bradley v. Sec'y of Health & Human Servs., 862 F.2d 1224, 1227 (6th Cir. 1988)). The undersigned finds the ALJ's evidentiary ruling here to be substantially supported and deserving of affirmance.

Furthermore, it is noteworthy that while plaintiff charges the ALJ with ignoring the evidence of his low GAF rating and the incongruous CRG assessment form, these charges are completely unfounded. Indeed, the ALJ discussed both items at some length (Tr. 331-32) on his way to ascertaining their respective evidentiary value. This is a far cry from erroneously determining plaintiff's level of impairment by "**ignoring** evidence" which would support the disability claim, as plaintiff accuses the ALJ of doing. (Docket

15

Entry No. 14 at 6 (emphasis in original)(quoting Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)). The ALJ aptly reasoned through the intersection between plaintiff's struggles with chemical dependence, compliance with prescribed treatment, and reduced intellectual functioning, as follows:

> Dr. Mallipeddi reported on October 3, 2001, that cannabis abuse was in remission, but that symptoms of depression continued. Exhibit 5F. However, the September 4, 2002, Centerstone treatment note (Ex. AC-1 p. 4) and Dr. Mallipeddi's treatment note from October 9, 2002, (following an absence from treatment since May 2002), refuted [her] previous report that drug abuse was in remission. [She] indicated that the claimant had asserted no drug use for six months, but had stopped coming to treatment when unscheduled drug screening (UDS) was ordered. [H]er diagnoses were for dysthymia, cannabis abuse with cannabis induced psychosis and an antisocial personality disorder. [She] prescribed Lexapro and Sonata. Centerstone's summary CRG assessment of September 8, 2003, continues to list cannabis abuse (305.20) and alcohol abuse (305.00) as diagnoses. Exhibit 10F. Centerstone Global Assessment of Functioning (GAF) ratings from October 2001 through September 2003 were consistently in the range of 40 to 50. Exhibit 9F and 10F. As explained in DSM-IV-TR (2000, p. 34), GAF in the range of 51-60 indicates only "moderate symptoms" whereas GAF of 50 and below indicates "serious symptoms" that would typically preclude work. Thus, the GAF ratings were just as low when the claimant alleged abstinence from DA/A as when it was ongoing, as was strongly suggested by his cessation of treatment upon the institution of drug abuse monitoring. The record as a whole persuasively establishes that there has actually been no sustained period of abstinence from DA/A since the alleged onset and that, consequently, the GAF ratings in the 40-50 range included mental functional deficits materially resulting from ongoing DA/A. The evidence generated since the January 6, 2004, denial decision was issued continues to establish that DA/A is a material limiting factor with regard to the claimant's ability to work.

* * *

> ... Whatever limitations he was actually experiencing [at his third Centerstone intake in May 2004], the diagnoses on the CRG establish that they still

significantly resulted from cannabis abuse, with that listed as a secondary diagnosis (code 305.20) in addition to the primary diagnosis of dysthymia (300.4). Consistent with past noncompliant behavior, he did not show for his June 3, 2004, appointment. He came in to see Dr. Graves on June 22, 2004. Dr. Graves' note reports a "diffuse picture of low grade symptoms." He received a renewal prescription for Lexapro. Ex. 12F pp. 37-38 and 42. The claimant then proceeded to skip the next 4 appointments in a row (July 8, and August 9, 23 and 30, 2004). Ex. 12F.

He returned to see Dr. Graves on September 9, 2004. With regard to activities of daily living (ADLs), Dr. Graves noted that he "claims to be too insecure and paranoid to get public work; probably can do more if he tries harder, keeps up personal ADLs." As to interpersonal functioning, Dr. Graves indicated "avoidance, isolates; much avolition." Ex. 12F p. 20. Despite this equivocal endorsement of symptoms, the Centerstone CRG completed on September 13, 2003, continued to indicate moderate to marked symptoms, with GAF at 48. ... However, it is difficult to accord any credible weight to the September 13, 2004, CRG since the claimant did not show for his appointment scheduled for that date, and missed again on December 6, 2004.

* * *

[Plaintiff's attorney] Mr. Freemon also tries valiantly to establish that his client is mentally retarded. However, the indisputable evidence in this file is that the claimant was administered IQ testing (the Wechsler Adult Intelligence Scale) on 2 occasions, by Deborah Doineau, Ed.D., on August 10, 2000, (Ex. 1F) and by James Proffitt, M.S., on August 30, 2001, (Ex. 4F). No matter how Mr. Freemon tries to slice it, the results of both tests were deemed invalid by the mental health professionals who administered the tests and conducted the consultative examinations due to the claimant's lack of effort. In fact, Mr. Proffitt reached a specific diagnostic impression of "malingering." Ex. 4F p. 5. Mr. Freemon even goes so far as to attempt to interpose his own "belief" that the poor effort to which Dr. Doineau and Mr. Proffitt ascribe the low IQ scores to thus invalidate them "is just a symptom of his mental retardation and learning disability itself." This argument is circular, to say the least. Further, I am not aware that Mr. Freemon has any particular experience or expertise in mental illness diagnostics or authoritative "beliefs." This record

> simply will not support a diagnosis of mental retardation.

(Tr. 331-33) The foregoing findings are substantially supported on the record as a whole.

Plaintiff next argues that the ALJ erred in crediting the assessment of consulting psychologist Deborah Doineau, Ed.D., over the assessments of treating psychiatrists Mallipeddi and Graves. Plaintiff cites the rule in the Sixth Circuit that greater weight is given to treating physicians' opinions than to the contrary opinions of government consultants. Citing Hurst v. Schweiker, 725 F.2d 53, 55 (6th Cir. 1984). However, plaintiff does not explain nor does the record otherwise reveal any genuine inconsistency between the assessments of Drs. Doineau, Mallipeddi, and Graves. Indeed, the ALJ drew from all of these sources in determining the extent of plaintiff's work-related mental limitations. The opinions of plaintiff's treating psychiatrists were not discounted in favor of Dr. Doineau's assessment, other than to the extent that the GAF scores from Centerstone were given less weight due to their reflection of drug-induced deficits. The undersigned finds no error here.

Plaintiff's remaining arguments center around the extent to which the vocational expert was fully informed of plaintiff's work-related limitations prior to testifying to the existence of jobs which plaintiff could perform. In particular, it is argued that plaintiff's functional illiteracy and alleged mental retardation would not be affected by drug abuse or the lack thereof, and that the ALJ's failure to include such deficits in his hypothetical question to the vocational expert requires reversal of the ALJ's decision. However, as discussed above, the ALJ's analysis of plaintiff's alleged mental retardation versus borderline-to-average intellectual functioning is supported by substantial evidence. With regard to plaintiff's illiteracy, it is clear that this limitation was in fact included in the

18

ALJ's hypothetical to the vocational expert (Tr. 371). Plaintiff's argument to the contrary is misplaced.

After determining that plaintiff's disability under the Listings was materially contributed to by his drug addiction, the ALJ proceeded to make substantially supported findings with regard to the effects of plaintiff's severe physical and mental impairments in the absence of such drug abuse, including findings supported by properly elicited expert testimony under the SSA's limited step five burden of proving the existence of other jobs in the economy which plaintiff could perform. These findings and the ALJ's ultimate conclusion -- that plaintiff's combination of impairments is not disabling when the effects of his drug abuse are eliminated from consideration -- are proper and deserving of affirmance.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the SSA be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 20th day of October, 2008.

                                                s/ John S. Bryant
                                                JOHN S. BRYANT
                                                UNITED STATES MAGISTRATE JUDGE